## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------- x
                              :

RICHARD R.[1],                  :         No. 3:22-CV-1037 (RMS)
*Plaintiff,*                :
                              :
V.                          :
                              :
KILOLO KIJAKAZI, ACTING      :
COMMISSIONER OF SOCIAL      :
SECURITY,                :
*Defendant.*               :
                              :         DATE: September 13, 2023
                              :
----------------------------------------------------- x

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

      This is an administrative appeal following the denial of the plaintiff's applications for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and supplemental security income benefits ("SSI") under Title XVI of the Act.  It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[2]

---

[1]  To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial.  *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2]  Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment income for a set period prior to application.  *See* 42 U.S.C. §§ 423(a)(1)(a), *id.* at 423(c)(1).  "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability.  *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013).  *See* 42 U.S.C. § 1382(a).  "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness."  *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023).  *See Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003) (explaining, in a Social Security case, that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI").

The plaintiff now moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner"). (Doc. No. 19). In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings. (*Id.*). The Commissioner, in turn, has moved for an order affirming her decision. (Doc No. 20).

For the following reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **GRANTED in part and DENIED in part,**[3] and the Commissioner's motion for an order affirming that decision is **DENIED**.

## I.   PROCEDURAL HISTORY

On October 30, 2018, the plaintiff filed an application for both DIB and SSI benefits claiming that he had been disabled since August 3, 2018, due to status-post right hip replacement; bilateral osteoarthritis of the knees; lumbar spine degenerative changes; obesity; depressive disorder; and anxiety disorder. (Doc. No. 13, Certified Transcript of Administrative Proceedings, dated September 14, 2022 ["Tr."] 15, 92, 93, 122, 127, 135, 139). The plaintiff's applications were denied at the administrative level both initially on February 13, 2019, and upon reconsideration on June 4, 2019. (Tr. 120, 121). On August 19, 2021, a virtual video hearing was held before Administrative Law Judge ("ALJ") John Aletta, at which the plaintiff and a vocational expert ("VE"), Stella Frank, testified. (Tr. 15, 41).[4] On September 29, 2021, the ALJ issued an unfavorable decision denying the plaintiff both DIB and SSI benefits. (Tr. 12, 27). On June 29, 2022, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1).

---

[3] The Court grants the plaintiff's motion to remand the case for further administrative proceedings, but denies with respect to the plaintiff's request for a remand for the calculation and award of benefits.

[4] The plaintiff originally had a video hearing scheduled for May 6, 2021, but he failed to appear and an order to show cause was issued. (*See* Tr. 34–40, 320, 352–53). The plaintiff then successfully scheduled his second hearing and appeared and testified. (*Id.*). The hearings were held virtually due to the COVID-19 pandemic. (*See* Tr. 43, 358, 356–57).

On August 17, 2022, the plaintiff filed his complaint in this pending action.  (Doc. No. 1).

On September 30, 2022, the parties consented to the jurisdiction of a United States Magistrate

Judge, and the case was transferred to the undersigned on October 5, 2022.  (Doc. Nos. 12, 15).

On January 6, 2023, the plaintiff filed his Motion to Reverse the Decision of the Commissioner

(Doc. No. 19) with a Statement of Material Facts (Doc. No. 19-2) and a brief in support (Doc. No.

19-1).  On March 6, 2023, the Commissioner filed her Motion to Affirm (Doc. No. 20), with a

responding Statement of Material Facts (Doc. No. 20-2) and a brief in support  (Doc. No. 20-1).

The plaintiff did not file a reply.

## II.     FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is

thoroughly discussed in the parties' statements of material facts.  (*See* Doc. Nos. 19-2, 20-2).  The

Court cites only the portions of the record that are necessary to explain this decision.

### A.     The Plaintiff's August 19, 2021 Telephonic Hearing Testimony

Before taking the plaintiff's testimony over the telephone, the plaintiff's counsel indicated

that the ALJ would be receiving outstanding and recent documentation from Dr. Borgonos of

Community Health Center, the plaintiff's primary care physician ("PCP"), as well as potential

information from a rheumatologist at Hartford Healthcare.  (Tr. 45–46).  The ALJ allowed

plaintiff's counsel 21 days to submit those materials.  (Tr. 47).  Additionally, the plaintiff's counsel

asked to amend the plaintiff's alleged onset date ("AOD") from August 3, 2018 to August 3, 2017,

on the grounds that the plaintiff's hip problems began prior to 2018.  (*Id.*).  The ALJ acquiesced

to this request.  (*Id.*)

After being sworn in, the plaintiff testified as follows. The plaintiff stated that he was 42 years old, weighed 245 pounds, and was 5'8" in height.  (Tr. 48).  The plaintiff had completed ninth grade but never received a GED and had never performed any specialized work.  (Tr. 49).

The plaintiff then reviewed his work history.  The plaintiff described that, from 2007 to 2015, he worked as a truck driver making deliveries and a warehouse forklift operator for a company called CW Resources.  (Tr. 49–51).  He explained that "a lot of the time" he was in the warehouse operating the forklift, but he would also drive the truck (which was 28-feet long) on certain days.  (Tr. 50).  He affirmed that, in performing both jobs, he did not do much other than sitting.  (Tr. 50–51).  The plaintiff testified that he would lift or carry about 50 pounds or greater on a regular basis at this job.  (Tr. 50).  The plaintiff denied that he was currently working or conducting any businesses.  (Tr. 51).

The ALJ then questioned the plaintiff as to why he believed he could not work any job.  (Tr. 51).  The plaintiff explained that he suffered from pain and swelling in his knees, hip, and right shoulder due to arthritis and that these symptoms would start in the early morning and go on throughout the day.  (Tr. 51–52).  The plaintiff stated that, to alleviate these issues, he took medication for swelling and muscle spasms, as well as sleeping pills.  (Tr. 52).  He denied that these medications had any side effects.  (*Id.*).  The plaintiff relayed that he had undergone a right hip replacement on August 3, 2018, but had no other surgeries.  (Tr. 53).  The plaintiff further denied any treatment for psychological problems, or for drug or alcohol addiction.  (*Id.*).

The plaintiff explained that he had pain in his right elbow that made it painful to pick up more than five or ten pounds.  (Tr. 53).  He also had issues bending due to his hip and knees.  (Tr. 54).  He stated that it was painful to walk and that the pain would start in the morning.  (*Id.*).

4

Regarding his mental faculties, the plaintiff testified that he has a "little bit" of a problem with his memory and concentration in that he would forget quickly.  (Tr. 54).  However, he had no issues getting along with other people, and he lived with his girlfriend.  (*Id.*).

As to his activities of daily living, the plaintiff testified that he could sweep and fold clothes on his own but "that's about it."  (Tr. 54).  His girlfriend would do the laundry and assist with food prep and occasionally the plaintiff's personal hygiene regime.  (Tr. 54–55, 61).  As the plaintiff could not bend over, his girlfriend would assist him with bathing and dressing.   (Tr. 61).  His girlfriend would also go grocery shopping for him, but he would go along for the ride.  (Tr. 55). The plaintiff would pass the time by watching television and occasionally visiting his girlfriend's children.  (Tr. 55–56.).  The plaintiff had not left Connecticut in the last three years.  (Tr. 56).

Upon examination by his attorney, the plaintiff also testified as follows.  The pain in the plaintiff's hips and legs made it so difficult to bend over that he was unable to put his socks or pants on by himself, and he needed the assistance of his girlfriend.  (Tr. 57).  When the plaintiff would stand and start walking, his legs would "give up" on him and get "gummy."  (*Id.*).  When that occurred, he had to wait for a few minutes for his leg to "get back" before he could walk again. (*Id.*).  It was the plaintiff's left knee that was the "big problem" or cause for his legs "giving up" or going "gummy."  (*Id.*).

The plaintiff used a cane both inside his apartment and "all the time" on the streets.  (Tr. 58).  He also testified that his right knee gave him issues as it had a "throb[bing] pain," but that it was primarily his left knee that was worse.  (*Id.*).  The plaintiff had undergone a right hip replacement about three years prior, and the replacement was also giving him left hip problems. (*Id.*).  The plaintiff also had difficulty sitting; he would have to "sit a certain way" and then "within

a half hour" he would get "numb" and need to get up and move around before sitting back down. (Tr. 58–59).  Additionally, if he walked too much he would have to sit down and rest.  (Tr. 59).

When he was at home, the plaintiff would spend most of his time laying down on a bed so that his body could rest and so as not to put pressure on his joints, which would "help[ him] out." (Tr. 59).  The plaintiff also suffered from sleep apnea that would wake him up and leave him feeling tired during the day.  (Tr. 59–60).  Additionally, the plaintiff suffered from episodes of vertigo, which gave him dizzy spells that prevented him from walking or driving.  (Tr. 60).  Once a vertigo episode had started, the plaintiff would take pills for it (along with anti-nausea medication) which would "kind of help[] out" after twenty minutes, but not always.  (*Id.*).   His vertigo episodes could last for as long as four days.  (*Id.*).  During these spells, the plaintiff could not stand or go to the bathroom alone; he would need his girlfriend's assistance to move anywhere in the house.  (*Id.*)

### B.   The VE's Testimony

After being sworn in, the vocational expert, Stella Frank, testified as to the following, based upon her review of "portions" of the plaintiff's file and listening to his testimony at the hearing. (Tr. 61–62).

First, the VE provided a description of the plaintiff's prior work based on his testimony at the hearing.  The VE opined that the plaintiff had worked as: (1) a Delivery Driver (DOT 292.353-101; SVP 3; medium exertion level), and had performed this job at an exertion level of medium; and (2) an Industrial Truck Operator for forklifts (DOT 921.683-050; SVP 3; medium exertion level), and that it was also performed at a medium exertion level.[5]  (Tr. 62).  The VE opined that,

---

[5] The regulatory definitions of the physical exertion requirements can be found at 20 C.F.R. §§ 404.1567 (DIB) and 416.967 (SSI).  The regulations provide for a range of potential exertion capacities from "very heavy work" to "sedentary work."  *See id.*

based on the testimony, these were composite jobs.  (*Id.*).  The VE also confirmed that her testimony was consistent with the DOT.[6]  (*Id.*).

The ALJ then put forth several hypotheticals to the VE based on the plaintiff's putative limitations. In the first hypothetical, the hypothetical person was of the same age, education, and experience as the plaintiff and was limited to "light" exertional work; occasionally used a cane for walking and for walking over rough uneven surfaces; could occasionally climb ramps and stairs; could occasionally climb ladders, ropes, or scaffolds; could frequently balance and frequently stoop; would occasionally kneel, crouch, and crawl; could not work at unprotected heights; could perform simple, routine tasks, but not at a "strict production-rate pace"; and could tolerate occasional brief interaction with the general public.  (Tr. 63).  The VE opined that this first hypothetical person could not perform any of the plaintiff's prior identified work.  (*Id.*).  The VE further opined that there were no light level jobs existing in the national economy that fit within the parameters of the first hypothetical, due to the hypothetical person's need for occasional use of a cane.  (Tr. 64).  However, there were three sedentary, Specific Vocational Preparation ("SVP") level 2 jobs[7] in the national economy that the VE could identify that the plaintiff could perform: (1) Document Preparer (DOT 249.587-018; SVP 2; sedentary exertion; 17,000 jobs in the national economy); (2) Addresser (DOT 209.587-010; SVP 2; sedentary exertion; 11,000 jobs in the national economy); and (3) Cutter Paster (DOT 249.587-014; SVP 2; sedentary exertion; 650 jobs in the national economy).  (Tr. 64–65).  The VE opined that other jobs at the sedentary level would

---

[6]  The Dictionary of Occupational Titles ("DOT") is an official publication of U.S. Department of Labor and is often relied on by VE's in steps Four and Five of the disability evaluation "for information about the requirements of work in the national economy."  *See* SSR 00-4P (S.S.A. Dec. 4, 2000) ("The regulations at 20 C.F.R. §§ 404.1566(d) and 416.966(d) provide that [the Commissioner] will take administrative notice of 'reliable job information' available from various publications, including the DOT.").

[7]  Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  SVP level 2 jobs are defined as those requiring anything beyond short demonstration, up to and including 1 month.

require "production pace" or require more than occasional brief interaction with the public.  (Tr. 64).

When queried by the ALJ, the VE affirmed that her testimony regarding the first hypothetical was consistent with the DOT, except that the DOT did not address the hypothetical person's need to use a cane, and it also did not specifically address production-paced work.  (Tr. 65).  Rather, the VE relied on her "overall professional experience," *i.e.*, her education, training, and experience in vocational rehabilitation and disability case management, to form and address those portions of her opinion.  (Tr. 65–66).  Further, the VE also relied on this background to address how the hypothetical's limitations on the individual's ability to recall simple, routine instructions and interact with the public would affect the jobs available, because the DOT also did not address these considerations.  (*Id.*).  The VE further affirmed that she had "actually seen the[] three jobs" referenced performed in the labor market and that she also drew upon this experience when answering the hypothetical.  (Tr. 66).

The ALJ then offered a second hypothetical, based on the first, except the exertion level was modified from light to "sedentary."  (Tr. 66).  The VE agreed that the same three jobs originally opined upon could be performed under this second hypothetical, and that there would be no "job erosion."  (Tr. 66).  The VE also affirmed that her testimony was again based upon her professional experience, as well as the DOT.  (Tr. 66–67).

The ALJ then offered a third hypothetical, which mirrored the first two hypotheticals except that the third hypothetical person had the additional limitation of being "off task 15 percent of the time during each workweek."  (Tr. 67).  Under this third hypothetical, the VE opined that there were no jobs in the national economy that could be performed.  (*Id.*).  The VE clarified that

the DOT did "not specifically address" these limitations, so they were based upon her professional experience.  (*Id.*).

Lastly, the VE provided a brief summary of the sources and methods she relied upon for determining the job numbers she provided.  (Tr. 67).  These included government data sources, including data from the Department of Labor's Bureau of Labor Statistics, as well as a software program called "SkillTRAN" from JobBrowser Pro.  (Tr. 68).  The reason for using SkillTRAN, the VE explained, was because it utilized a methodology to extrapolate job numbers from the government data "down to the DOT level," since there was no "entity, government or otherwise" that "collect[ed] data down to the DOT level."  (Tr. 69).

### C.    Objective Medical Evidence[8]

### 1.    Physical Impairments

On August 3, 2017, an MRI of the plaintiff's right hip conducted at The Hospital of Central Connecticut ("HOCC") revealed severe osteoarthritic changes, including "complete loss of joint space," with flattening and dysplastic appearance to the femoral head.  (Tr. 518).  On August 14, 2017, the plaintiff reported to Elzbieta Picharz-Dyjak, M.D. at Community Health Center ("CHC") that he had experienced worsening right hip pain for over three years, without any benefit from physical therapy.  (Tr. 506).  Based on the results of the plaintiff's MRI, Dr. Picharz-Dyjak referred the plaintiff to orthopedic surgery, for evaluation and treatment.  (*Id.*).  On September 28, 2017, the plaintiff received a hip injection after presenting to Ovanes Borgonos, M.D. with hip pain, as well as hard, subcutaneous nodules on his right wrist, right shoulder and left knee.  (Tr. 503–04).  On October 10, 2017, the plaintiff reported to the emergency department ("ED") at HOCC, where

---

[8] The following recitation of the objective medical evidence is based upon the plaintiff's statement of material facts (Doc. 19-2)—which the defendant explicitly adopted in full (*see* Doc. No. 20-2)—as well as the ALJ's decision and the Court's own review of the administrative record.

he complained to Richard Misiaszek, M.D. of persistent pain to his right hip and knee, with exacerbation of the knee pain following a "mechanical fall" onto his right side. (Tr. 597). Provider notes from this ED visit indicate that the plaintiff had full range of motion of the hip and knee, with a steady gait. (Tr. 599). The plaintiff received additional hip injections on November 6, 2017 and January 24, 2018. (Tr. 500–01, 1068–69).

On February 12, 2018, the plaintiff was evaluated by orthopedic surgeon Roy Beebe, M.D., who diagnosed the plaintiff with advanced degenerative arthritis of the right hip, and reported to Dr. Borgonos that the plaintiff wanted to receive hip replacement surgery. (Tr. 557–58). On April 14, 2018, May 24, 2018, and July 23, 2018, the plaintiff again reported to the ED with chronic pain. (Tr. 649, 691, 739). On August 3, 2018, the plaintiff underwent a successful hip replacement surgery at UConn Health. (Tr. 551, 556). The plaintiff's hip surgery was initially scheduled for May 17, 2018, but was delayed due to the plaintiff suffering a urinary tract infection. (Tr. 669–671, 699).

On August 9, 2018, the plaintiff reported to the ED at HOCC with right knee pain, which was determined to have stemmed from excessive massage to that area, and on August 30, 2018, the plaintiff complained of right hip, knee, and big toe pain during a visit with Dr. Borgonos. (Tr. 490, 575–76). On September 8, 2018, the plaintiff again presented to the ED at HOCC, where he was diagnosed with cellulitis and postoperative infection and provided treatment and medication. (Tr. 766–67).

Plaintiff began a course of physical therapy for his right hip on September 11, 2018, at HOCC. (Tr. 786). On October 2, 2018, the plaintiff presented to Dr. Beebe for a post-operative follow up. (Tr. 539). There, the plaintiff was noted as walking with a cane for balance, but without a limp. (Tr. 540–41). Further, imaging demonstrated a "well-positioned hip-replacement." (Tr.

541).  On October 8, 2018, the plaintiff visited the ED at HOCC for an evaluation of his left ankle pain, after accidentally striking his ankle with a dull axe on or about October 5, 2018.  (Tr. 813). The plaintiff's ankle was bandaged with "Ace wrap," and he was provided crutches and pain medication.  (Tr. 815).  On October 19, 2018, the plaintiff reported to Michelle Carli, PT that he was no longer using a cane, and that his pain decreased during the day.  (Tr. 837).  By October 23, 2018, the plaintiff reported that overall, his hip was doing better, but that he still experienced pain, and continued with an antalgic gait pattern.  (Tr. 841).  The following week, on October 30, 2018, the plaintiff reported feeling good, but noted experiencing a sharp pain on the right side of his lower back a few days prior.  (Tr. 849).

On May 3, 2019, the plaintiff presented to the ED at HOCC with acute onset lumbar back pain, which he described as sharp waves of pain from his back toward his flank region and into his right groin.  (Tr. 997).  The plaintiff was described as ambulatory with the use of a cane.  (*Id.*).  X-rays taken of the plaintiff that day demonstrated normal vertebral alignment, but did show lumbar degenerative changes and disc space narrowing.  (Tr. 1002).  On May 21, 2019, the plaintiff was seen at CHC by Anthony Yoder, DO, where the plaintiff complained of intense right shoulder pain, and received an injection.  (Tr. 1274–75).  X-rays conducted on June 4, 2019 revealed bilateral tricompartmental knee osteoarthritis.  (Tr. 1280).

On June 19, 2019, the plaintiff presented for another post-operative follow up with Dr. Beebe.  (Tr. 1262).  Dr. Beebe noted that the plaintiff was doing well following his hip replacement surgery, and that the plaintiff complained of infrequent episodes of pain in the right hip area, left knee pain, and bilateral shoulder pain.  (Tr. 1263–64).  Dr. Beebe further noted that the plaintiff is doing very well using a cane to walk, and was otherwise essentially unassisted.  (Tr. 1263).  X-rays conducted during this visit demonstrated: (a) normal shoulders; (b) moderately advanced

lateral and patellofemoral degenerative arthritis with joint space narrowing of the left knee; and (c) early degenerative changes of the left hip. (Tr. 1264). The plaintiff received a cortisone injection to his left knee, and Dr. Beebe concluded that the plaintiff's shoulder pain may stem from his use of a cane. (Tr. 1265). On August 30, 2019, the plaintiff presented to Earl Hornbake III, M.D. at CHC, where he was diagnosed with a tear of the medial meniscus of the left knee and acute left shoulder pain. (Tr. 1269).

On February 22, 2020, the plaintiff presented to CHC with bilateral knee pain. (Tr. 1698). The plaintiff was initially seen by Edin Memisevich, APRN, who provided him with a knee brace and took x-rays of his knees. (*Id.*). A telephonic follow-up visit was conducted on March 28, 2020. (Tr. 1696). There, the plaintiff requested a referral to orthopedics, after imaging revealed osteophytes (bone spurs) of his bilateral knees. (*Id.*).

On April 5, 2020, the plaintiff visited Middlesex Health Urgent Care, following a motor vehicle accident. (Tr. 1506). The plaintiff reported worsening pain in his lower back and right hip, and upon examination, had a normal inspection of his back, with no swelling, redness, or deformity. (Tr. 1508). The plaintiff was further assessed as having a tender right hip which experienced pain with flexion and extension, and was diagnosed with a lumbosacral strain. (Tr. 1508–10). The plaintiff also saw Dr. Beebe on May 13, 2020 in regard to the lower back strain following the motor vehicle accident, and noted using a cane primarily for buttocks pain. (Tr. 1673, 1675). Moreover, on June 11, 2020, the plaintiff presented to Wei Zu, M.D. of Hartford Orthopedic Medicine ("HOM") for an evaluation of his low back and right hip pain following the motor vehicle accident. (Tr. 1511). The plaintiff described his pain as dull and achy, and as being aggravated by prolonged sitting, standing, and/or bending. (*Id.*). Upon examination by Dr. Xu, the plaintiff was diagnosed with a lumbar strain and sprain, and prescribed a muscle relaxant. (Tr.

1512–1513).  On September 10, 2020, during a five-month accident follow-up, Dr. Xu noted, *inter alia*, that the plaintiff had declined physical therapy, and that he had a slightly limited range of motion in his lumbar spine with flexion and extension, but with a better gait.  (Tr. 1515).

On April 8, 2020, the plaintiff presented to Henry Janczak, D.C. at Shaw Chiropractic, where he was assessed as having a significantly limited lumbosacral range of motion with pain at the end range, and an altered gait due to right hip pain.  (Tr. 1524).  Thereafter, the plaintiff attended approximately twenty chiropractic sessions with Dr. Nicole St. Cyr at Shaw Chiropractic between April 13, 2020 through June 15, 2020.  (Tr. 1534–41).  On June 17, 2020 and August 3, 2020, the plaintiff again presented to Shaw Chiropractic and reported continued, but improved, low back pain.  (Tr. 1526, 1529).  At the August 3, 2020 appointment, Dr. Janczak noted that the plaintiff's hip pain was hindering further gains due to his altered gait and excessive motion of the lumbar spine.  (Tr. 1529).  On September 28, 2020, the plaintiff reported that he had not experienced any change in his back pain since the prior visit, and that the pain worsened with forward bending.  (Tr. 1531).  Dr. Janczak further noted that while the plaintiff's condition appeared to be stabilizing, his active lumbosacral range of motion was not at normal limits yet. (*Id.*).  In the "Final Report" from Shaw Chiropractic on October 26, 2020, the plaintiff reported continued low back pain, and upon examination, was deemed as having persistent joint dysfunctions at the L4-L5 vertebral levels, with limitations noted in all planes, especially forward flexion and extension.  (Tr. 1532).

During visits with Dr. Borgonos on August 13, 2020, January 14, 2021, May 20, 2021 and July 8, 2021, the plaintiff reported worsening bilateral knee pain.  (Tr. 1688–91, 1775, 1779).

### 2.      Mental Impairments

On September 28, 2017, a depression screening was conducted by Dr. Borgonos, which revealed that the plaintiff suffered from moderately severe depression.  (Tr. 503).  More specifically, the plaintiff reported feeling tired, having little energy, and having trouble concentrating on things nearly every day.  (*Id.*). The plaintiff also reported having little interest or pleasure in doing things, and feeling down, depressed, or hopeless.  (*Id.*).  On October 11, 2019, the plaintiff reported increasing memory loss and anxiety attacks to Dr. Borgonos, and was consequently referred to neuropsychology.  (Tr. 1267).

### D.      Medical Opinion Evidence

The ALJ considered the medical opinion of Dr. Ovanes Borgonos, as well as an administrative finding by the Disability Determination Service ("DDS"), in connection with an assessment of the plaintiff's physical residual functional capacity ("PRFC").  (Tr. 24–25).  The ALJ also considered the medical opinion of Dr. Patrick Russolillo, Ph. D., as well as the DDS administrative finding, in connection with the plaintiff's mental residual functional capacity ("MRFC").  (*Id.*).

### 1.      Physical Impairments

As to the plaintiff's physical impairments, the ALJ first considered a medical source statement from Dr. Borgonos.  (Tr. 24).  Dr. Borgonos opined that, during an eight-hour day, the plaintiff could sit for about two hours and stand and/or walk for about two hours.  (*See id.* (citing Tr. 1663–66)).  Dr. Borgonos further opined that the plaintiff must use a cane or other hand-held assistive device while engaging in occasional standing/walking, and would also require a job that permits shifting positions at will from sitting, standing, or walking, as well as two daily, unscheduled ten-minute breaks for rest.  (Tr. 1664).  Dr. Borgonos also opined that the plaintiff

would be absent from work for about three days per month.  The ALJ concluded that Dr. Borgonos's opinion was not persuasive, because: (a) the medical evidence, including Dr. Borgonos's own treatment notes, did not support the aforementioned limitations in standing, walking, and changing positions; and (b) the opinion was otherwise inconsistent with the record evidence describing only brief periods of gait difficulty occurring *before* the plaintiff's replacement surgery and *after* his motor vehicle accident.  (Tr. 24).  The ALJ further emphasized that "[r]egular treatment notes describe only occasional use of a cane for balance support without substantial loss of mobility."  (*Id.*).

The ALJ next considered the administrative findings issued by DDS, which found at both the initial and reconsideration levels that the plaintiff could: (1) stand and/or walk for six hours in a normal eight-hour workday; (2) sit for six hours in an eight-hour workday; (3) occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds; and (4) ultimately, sustain a full range of medium work.  (Tr. 25 (citing Tr. 70–80, 107–119)).  The ALJ concluded that the DDS findings were not persuasive, insofar as they failed to consider evidence beyond the plaintiff's hip replacement surgery, and were otherwise inconsistent with updated treatment notes reflecting residual pain, restricted lumbar range of motion, and intermittent use of a cane.  (*See* Tr. 25).

### 2.    Mental Impairments

As to the plaintiff's mental impairments, the ALJ first considered a medical source statement from Dr. Russolillo.  (Tr. 24).  Dr. Russolillo opined that, while the plaintiff had mild limitations in understanding and remembering complex instructions, carrying out instructions, and making judgments on complex work-related decisions, the plaintiff otherwise had normal functioning in all other areas of work-related function.  (*Id.* (citing Tr. 865–69)).  Dr. Russolillo further acknowledged that the plaintiff received a score of "20" on his Montreal Cognitive

Assessment ("MOCA") screening, which is "consistent with a Mild Deficit" to his cognitive function. (*See* Tr. 866). The ALJ concluded that Dr. Russolillo's opinion was persuasive in part, because, while Dr. Russolillo's report and conclusions generally supported his opinion that the plaintiff's mental impairments did not establish substantial functional difficulties, his specific opinion that the plaintiff had, at most, a mild limitation in his ability to complete complex tasks was not fully consistent with the plaintiff's MOCA score. (Tr. 25). As such, the ALJ further concluded that Dr. Russolillo's opinion slightly understated the plaintiff's mental functional limitations. (*Id.*).

The ALJ next considered the DDS administrative findings, which found at the initial level that the plaintiff did not have a severe mental impairment, but, upon reconsideration, determined that the plaintiff had moderate limitations in his ability to: (1) understand, remember, and/or carry out detailed instructions; (2) interact with others; and (3) maintain concentration, persistence, and pace over the course of a normal workday and workweek. (*See* Tr. 25 (citing Tr. 70–80, 107–119)). The DDS finding further found, upon reconsideration, that the plaintiff's low mood and anxiety provided occasional distraction, and generally led to inconsistent work effort and "occasional impersistence." (Tr. 116). As such, DDS found that the plaintiff remained able to perform simple tasks and meet minimum production requirements over the course of a normal workweek, provided he was not subject to strict production quotas. (*Id.*). The ALJ concluded that the DDS findings were partially persuasive, insofar as they were generally consistent with the limited evidence of mental health treatment, and that the DDS finding upon reconsideration was otherwise supported by Dr. Russolillo's opinion. (Tr. 25).

III.    **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Social Security Act ("SSA"). *See* 20 C.F.R. § 404.1520(a).[9]

Notably, prior to engaging in the substantive disability analysis, the ALJ's decision reviewed the procedural history of the case and noted that the plaintiff had amended the alleged onset date to August 3, 2017.  (Tr. 15).  The ALJ also admitted additional evidence into the record. (*Id.*).

Thereafter, in turning to the merits of the five-step analysis, the ALJ first determined that the plaintiff met the insured status requirements under the SSA through December 31, 2020.  (Tr. 16, 18).  At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 3, 2017.  (Tr. 18).

At step two, the ALJ determined that the plaintiff had the following severe impairments: status-post right hip replacement; bilateral osteoarthritis of the knees; lumbar spine degenerative changes; obesity; depressive disorder; and anxiety disorder.  (*Id.*).  Additionally, the ALJ found that the plaintiff's reported "right shoulder and left hip impairments [did] not impose more than

---

[9] First, an ALJ must determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment.  If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

minimal functional limitations sufficient to support a finding of severe impairments" given radiological imaging and physical examinations. (Tr. 18) (citing exhibits). The ALJ found the same was true for the plaintiff's sleep apnea and intermittent scrotal abscesses, *i.e.*, that they did not constitute severe impairments at step two. (*Id.*).

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18–20). *See generally* 20 C.F.R. part 404, Subpart P, Appendix 1. In doing so, the ALJ considered Listings 1.15, 1.16, 1.17, and 1.18, all of which regard Musculoskeletal Disorders, as well as Listings 12.04 (Depressive, bipolar, and related disorders) and 12.06 (Anxiety and obsessive-compulsive disorders). (*Id.*). As to the Listings regarding Musculoskeletal Disorders, the ALJ found that they were not met or medically equaled here, because the objective medical evidence failed to establish either: (a) that the plaintiff suffered any impairment-related physical limitation that lasted, or was expected to last, for a continuous period of at least twelve months; (b) a medical need for a walker, or bilateral cane/crutches; or (c) an inability to use either one or both upper extremities to independently initiate, sustain, and complete work-related activities involving fine and gross movements. (Tr. 19). The ALJ further found that Listing 1.17 was not met or medically equaled, because "the objective medical evidence does not establish a documented medical need for a walker, bilateral canes, [etc.]." (*See id.*). As to the Listings regarding mental impairments, the ALJ found that the plaintiff's mental impairments did not satisfy the "paragraph B" criteria because they did not cause either at least two "marked" limitations, or one "extreme" limitation. (Tr. 19–20). Similarly, the ALJ further found that the evidence in the record failed to establish the requisite "paragraph C" criteria. (Tr. 20; *see* 20 C.F.R. Part 404, Subp't P, App'x 1 at 12.00)).

Next, the ALJ formulated the plaintiff's residual functional capacity ("RFC").  A plaintiff's RFC is the most that they can do despite their impairments, and is determined by assessing all of the relevant evidence.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ determined that the plaintiff had the residual functional capacity to perform:

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following additional limitations: He must occasionally use a cane for walking and for walking over rough or uneven surfaces. He can occasionally climb ramps, stairs, ladders, ropes, and scaffolds. He can frequently balance and stoop. He can occasionally kneel, crouch, and crawl. He cannot work at unprotected heights. He can perform simple, routine tasks but not at a strict production rate pace, and can recall and execute simple, routine instructions. He can tolerate occasional, brief interaction with the general public.

(Tr. 20).

At step four, based on the VE's expert testimony, the ALJ found that the plaintiff could not perform any of his past relevant (composite) work ("PRW"), either as actually or generally performed.  (Tr. 25–26).

At step five, the ALJ concluded that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform," namely: document preparer, addresser, and/or cutter/paster as opined upon by the VE.[10]  (Tr. 26–27).

Given this finding, the ALJ concluded that the plaintiff was not disabled from his AOD to the date of the decision.  (Tr. 27.).

---

[10] The ALJ also found that the claimant had a "limited education" and that the "[t]ransferability of job skills [was] not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the claimant was 'not disabled' whether or not the claimant had transferable job skills.  (Tr. 26) (citing SSR 82-41).

## IV.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security]
pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an
appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).   The Court's
function is to first ascertain whether the ALJ applied the correct legal principles in reaching their
conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*,
817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by
substantial evidence, shall be conclusive[.]"   42 U.S.C. § 405(g).   *Brault v. Soc. Sec. Admin.,
Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).   Substantial evidence means more than a scintilla, "[i]t
means such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co.
v. NLRB*, 305 U.S. 229 (1938)).   Therefore, absent legal error, this court may not set aside the
decision of the Commissioner if it is supported by substantial evidence.   *Berry v. Schweiker*, 675
F.2d 464, 467 (2d Cir. 1982).   "Such a deferential standard, however, is not applied to the
Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar.
17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).   "This court must
independently determine if the Commissioner's decision applied the correct legal standards in
determining that the plaintiff was not disabled." *Id*.   "Where there is a reasonable basis for doubt
whether the ALJ applied correct legal principles, application of the substantial evidence standard
to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of
the right to have her disability determination made according to the correct legal principles."
*Johnson*, 817 F.2d at 986.

## V.    DISCUSSION

The plaintiff raises three primary arguments in support of a remand: (1) that "[t]he ALJ erred in framing an RFC without the support of medical opinions"; (2) that "[t]he ALJ erred in failing to evaluate the mental health medical opinions in accordance [with] the regulations"; and (3) that the ALJ failed to include all of the plaintiff's impairments and limitations in both formulating the plaintiff's RFC, and subsequently evaluating the plaintiff's ability to perform jobs existing in significant numbers in the national economy.  (Doc. No. 19-1 at 2, 13, 15).  The Commissioner argues that the ALJ's decision is supported by substantial evidence and free of "material legal error."  (Doc. No. 20-1 at 2).  More specifically, the Commissioner contends that "there is ample evidence supporting the ALJ's RFC for sedentary work with additional limitations, including frequent examinations showing good range of motion, intact sensation, intact strength, and the ability to ambulate unassisted."  (*Id.*).

The Court agrees with the plaintiff, and for the reasons set forth herein, finds that remand is warranted to facilitate a proper reformulation and explanation of the plaintiff's RFC. Accordingly, the Court will only address those additional arguments that are necessary to provide guidance to the ALJ on remand.[11]  On remand, the ALJ shall reformulate the plaintiff's physical RFC, and in doing so: (a) solicit additional medical opinion evidence; and (b) address the plaintiff's ability to do sedentary work (or less than sedentary work), and specifically evaluate a sit-stand option.  On remand, the ALJ is also instructed to reassess Dr. Russolillo's opinion and reformulate the plaintiff's mental RFC.  In reformulating the plaintiff's physical and mental RFC, the ALJ shall take care to review each medical opinion and ensure compliance with the regulations governing

---

[11] Specifically, because the Court is remanding on other grounds, the Court declines to reach the issues regarding the sufficiency of the evidence supporting the ALJ's mental RFC formulation, as well as the ALJ's Step Five evaluation of the plaintiff's ability to perform jobs existing in significant numbers in the national economy.

medical opinion evidence, which demand that the ALJ explicitly consider the two "most important" persuasiveness factors of "supportability" and "consistency."

A.       **The ALJ's RFC Formulation**

As a threshold matter, the plaintiff is challenging the sufficiency of the record evidence supporting the ALJ's exertional and non-exertional RFC findings.  The Court examines each in turn.

1.       **Exertional Limitations**

As to the plaintiff's exertional limitations, the plaintiff argues that, by determining that Dr. Borgonos's medical opinion was "unpersuasive," the ALJ was left with no substantive medical opinion to support his finding that the plaintiff could perform sedentary work, *i.e.*, that the plaintiff could "sit 6 hours in an 8 hour day."  (*See* Doc No. 19-1 at 2–8).  Accordingly, the plaintiff contends that the ALJ improperly substituted his own lay opinion for that of a trained medical expert.  (Doc. No. 19-1 at 6) (citing *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)).

The Commissioner contends that the ALJ properly chose not to attach any persuasive weight to Dr. Borgonos's opinion, and that "there simply was no requirement for the ALJ to discuss Dr. Borgonos' sitting limitations."  (*See* Doc. No. 20-1 at 3–11).  As such, the Commissioner argues that the "ALJ reasonably considered all the evidence of the record" when formulating the plaintiff's physical RFC, and that substantial evidence supports the sedentary finding.  (*See id.*).  Moreover, the Commissioner further argues that the RFC may still be proper even in the absence of any persuasive medical opinions.  (Doc. No. 20-1 at 4); *see Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) (finding it impermissible for ALJ to "substitute [her] own expertise or view of the medical proof for the treating physician's opinion").

Principally at issue here is whether the ALJ's finding that the plaintiff retained a maximum physical capacity to perform sedentary work is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(1) (A plaintiff's RFC is "the most [he] can still do despite [his] limitations").  The Court finds that the ALJ's physical RFC formulation is not supported by substantial evidence, because the ALJ rejected the only two medical opinions in the record that assessed the plaintiff's physical limitations, and otherwise misconstrued the objective medical records.

### a.        The ALJ's Rejection of the Medical Opinion Evidence

As an initial matter, the Court concludes that the ALJ committed harmful error by failing to consider any medical opinion evidence in formulating the plaintiff's RFC.  In so finding, the Court is particularly persuaded by the analysis set forth in *Leslie H. L. v. Comm'r of Soc. Sec. Admin.*, No. 21 CV 150 (SALM), 2021 WL 5937649, at *4 (D. Conn. Dec. 16, 2021).

In *Leslie H.L.*, the Court was faced with a nearly identical situation as presented here.  There, the ALJ gave no persuasive weight to "the two medical opinions that could have informed an RFC."  *Leslie H. L.*, 2021 WL 5937649, at *6.  "That left the ALJ with no expert opinion as to plaintiff's limitations and abilities."  *Id.*  Such a determination, the court opined, left the ALJ with "little affirmative evidence on which to rely in making his assessment."[12]  *Id.* (quoting *Badillo v. Berryhill*, No. 18 CV 8414 (ER), 2020 WL 1528118, at *9 (S.D.N.Y. Mar. 31, 2020) (granting the plaintiff's motion for remand)) (quotation marks and alteration omitted).  The court further opined

---

[12]  Earlier in the opinion, the court opined that finding a medical opinion "unpersuasive" "under the new regulations [was] equivalent to a finding that the opinion is entitled to 'no weight' under the old regulations."  *Leslie H. L.*, 2021 WL 5937649, at *6.  Under the regulations governing claims filed before March 27, 2017, medical opinions were assigned "weight" based on various factors.  20 C.F.R. § 404.1527(c).  Under the regulations governing claims filed on or *after* March 27, 2017, the ALJ determines "how persuasive" a medical opinion is, based on similar factors.  20 C.F.R. § 404.1520c.  "A finding that a medical opinion is 'unpersuasive' rather than 'somewhat persuasive,' or even 'minimally persuasive,' indicates that the opinion was given no effect by the ALJ."  *Leslie H. L.*, 2021 WL 5937649, at *5.  "As a matter of plain language and common sense, an unpersuasive opinion could have no role in the decision-making process. This makes a declaration that an opinion is 'unpersuasive' equivalent to an assignment of 'no weight' to that opinion."  *Id.*

that "[f]ormulating an RFC where the ALJ has given no weight to the medical opinions of record is particularly problematic where an ALJ sets aside a physician's detailed objective findings in favor of his own lay interpretation of raw medical data." *Id.* (cleaned up). "In the absence of [any] supporting expert medical opinion the ALJ should not have engaged in his own evaluations of the medical findings." *Id.* (quoting *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996)) (quotation marks omitted); *see also Deubell v. Comm'r of Soc. Sec.*, No. 18 CV 935 (HBS), 2019 WL 5781860, at *4 (W.D.N.Y. Nov. 6, 2019) (collecting cases, and accepting plaintiff's argument: "[l]eft with no opinion evidence supporting it, the RFC was an obvious product of the ALJ's own lay interpretation of the record."). In sum, the court found that "the RFC [was] not supported by substantial evidence" because "once the ALJ rejected the only two medical opinions in the record that assessed plaintiff's physical limitations, he was left with no medical opinion from which to construct the physical RFC." *Leslie H. L.*, 2021 WL 5937649, at *7 (cleaned up)

The ALJ's analysis here compels the same outcome. The ALJ's physical RFC finding limited the plaintiff to performing, at most, sedentary[13] work with the added limitation that he "must occasionally use a cane for walking and for walking over rough or uneven surfaces." (Tr. 20). However, in arriving at this conclusion, the ALJ rejected as "unpersuasive" both: (1) the physical medical opinion of the plaintiff's longtime treating provider, Dr. Borgonos (delivered in a standard Medical Source Statement); as well as (2) the state Disability Determination Service's

---

[13] Jobs qualifying as sedentary work "involve[] sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567. Under the SSA's internal guidelines, the term "'[o]ccasionally' means occurring from very little up to one-third of the time." SSR 83-10 (S.S.A. 1983). "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." *Id.*; *accord Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing same). However, "not all sedentary jobs require the employee sit for six hours straight without the ability to stand frequently or as needed." *Bellamy v. Apfel*, 110 F. Supp. 2d 81, 91 (D. Conn. 2000). *See Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("The regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight.").

prior administrative findings.  (*See* Tr. 24–25).  These were the only two medical opinions that addressed the plaintiff's physical capacities.  (*See id.*).  As the court explained in *Leslie H.L.*, finding a medical opinion "unpersuasive" "indicates that the opinion was given no effect by the ALJ," and "[a]s a matter of plain language and common sense, an unpersuasive opinion could have no role in the decision-making process."  2021 WL 5937649 at *5.  As such, without any consideration of the opinions of any actual medical experts, the ALJ necessarily relied on his own lay judgment to evaluate the medical records and formulate the RFC.[14]  *Theresa W. v. Comm'r of Soc. Sec.,* No. 20 CV 704 (LJV), 2021 WL 4324421, at *3 (W.D.N.Y. Sept. 23, 2021); *accord Leslie H. L.*, 2021 WL 5937649, at *7.  "Accordingly, the RFC is not supported by substantial evidence. This error requires remand."  *Leslie H. L.*, 2021 WL 5937649, at *7.

### b.      The ALJ's Assessment of the Medical Records

Absent consideration of the available medical opinion evidence, the ALJ was left with only treatment notes from emergency room visits, and the treatment notes from the plaintiff's various medical providers.  *See supra* Point II(C)(1).  Based upon the aforementioned treatment notes, the ALJ deduced that the plaintiff did not have "substantial deficits in strength, mobility and motor skills" and could still perform sedentary work with "moderate postural restrictions."  (*See* Tr. 22–25).  Yet, none of the ALJ's citations or discussion of these notes address the crux issue here— that is, the plaintiff's ability to sit a total of six hours in an eight-hour workday, the amount

---

[14]  The Commissioner proposes "that an ALJ may make the RFC finding even when the ALJ found all the opinions were less than fully persuasive."  (Doc. No. 20-1 at 5).  This argument misses the mark, and ultimately, has no bearing on the core issue at stake here, *i.e.*, that the ALJ arrived at his physical RFC formulation without considering or otherwise assigning *any* persuasiveness to *any* medical opinion.  Moreover, the Second Circuit cases relied upon by the Commissioner do not follow the instant fact pattern, nor do they explicitly stand for the notion that an ALJ may reach an RFC determination even without any supporting medical source opinions.  *See Corbiere v. Berryhill*, 760 F. App'x 54, 56 (2d Cir. 2019) (summary order) (noting the ALJ gave "some weight" to a "State agency psychiatric medical consultant"); *Wright v. Berryhill*, 687 F. App'x 45, 48 (2d Cir. 2017) (noting "the ALJ gave 'great weight' to Dr. Arguelles's opinion"); *Johnson v. Colvin*, 669 F. App'x 44, 46–47 (2d Cir. 2016) (noting the ALJ considered a "letter from Dr. Michael D'Angelo," and otherwise gave "'considerable weight' to the opinion of Dr. Renee Baskin").

generally required by "sedentary" work.  Rather, the ALJ discusses these notes in the context of the plaintiff's "range of motion," "mobility," use of a cane, and "gait abnormalities."  (Tr. 22–23). The ALJ also notes the lack of "progressive worsening of weakness or instability."  (Tr. 23). However, as the plaintiff correctly emphasizes, none of these considerations touch on whether or not the plaintiff can sit for six hours in one day, or how he may need to stand often enough to potentially render him able to only perform work that is less than sedentary.  (Doc. No. 19-1 at 7).

Moreover, the ALJ never even allowed a sit-stand option into the RFC, despite the plaintiff's testimony that "within a half hour" he would get "numb" and need to get up and move around before sitting back down.  (Tr. 58–59).  Not only does Dr. Borgonos's medical opinion generally corroborate the foregoing testimony, (*see* Tr. 1664, noting that the plaintiff must take ten-minute walking breaks every 90 minutes and requires a sit-stand option), but in fact, some of the treatment notes that the ALJ purportedly relied on do as well.  For example, Dr. Xu himself noted that the plaintiff, as of June 2020, was reporting posterior low back and hip pain and that his "pain is aggravated by *prolonged sitting*, standing and bending."  (Tr. 1511) (emphasis added).

At this juncture, the Court cannot find that the ALJ's RFC finding of sedentary work is supported by substantial evidence.  *Mungin v. Saul*, No. 19 CV 233 (RMS), 2020 WL 549089, at *10 (D. Conn. Feb. 4, 2020) ("It is well settled, however, that an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings.") (cleaned up).

Consistent with the foregoing, on remand, the ALJ is instructed to reformulate the plaintiff's physical RFC.  In doing so, the ALJ shall solicit additional medical opinion evidence such that the ALJ need not rely solely on his own lay judgment in evaluating the existing medical records.  Moreover, the ALJ's reformulated RFC shall also address the plaintiff's ability to do sedentary work (or less than sedentary work), and shall specifically address whether the plaintiff's

work must include a sit-stand option, the frequency of any such sit-stand option, and any effect

that it may have on finding other work in the national economy that the plaintiff can perform.[15]

### 2.    Non-Exertional Limitations

The plaintiff also argues that the ALJ erred in his assessment of the plaintiff's non-

exertional limitations, because the ALJ failed to adequately account for the plaintiff's *cognitive*

impairments.  More specifically, the plaintiff contends that the ALJ "substituted his own judgment

for that of Dr. Russolillo," and, ultimately, found "non-exertional impairments in cognition and

memory without a medical opinion that is truly honored."  (*Id.* at 12).  While framed somewhat

differently, the Court construes these arguments as functionally the same as those set forth *supra*

Point V(A)(1)(a), in connection with the ALJ's physical RFC formulation.  In other words, the

plaintiff appears to be arguing that, in light of the discrepancies between Dr. Russolillo's

assessment of the plaintiff's medical records and his own contemporary MOCA testing of the

plaintiff, the ALJ's mental RFC formulation "constitutes an arbitrary substitution of the ALJ's

own judgment for competent medical evidence."  (Doc. No. 19-1 at 12).

While the Court is persuaded by the plaintiff's argument in the context of his *physical* RFC,

it finds the plaintiff's argument in this context to be unavailing.  This is because, unlike the ALJ's

physical RFC formulation, which was reached without reliance on *any* supporting medical opinion

evidence, here, the ALJ based his mental RFC formulation in part on two medical opinions that

the ALJ found to be partially persuasive.  As such, the body of Second Circuit precedent that the

Court found inapplicable to the ALJ's physical RFC formulation is squarely on point here.  *See*

*Schillo*, 31 F.4th at 78 ("the ALJ's RFC conclusion need not perfectly match any single medical

---

[15] These instructions on remand obviate the plaintiff's third argument, insofar as the ALJ will have to formulate a new RFC and provide new hypotheticals to the VE at the second hearing.  (*See* Doc. No. 19-1 at 15–16) ("In the absence of an accurate RFC in the hypothetical posed to the VE, the Acting Commissioner has failed to carry her burden of proof of 'no disability' at Step 5, leaving the conclusion that the claimant is disabled").

opinion in the record, so long as it is supported by substantial evidence."); *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109 (2d Cir. 2020) (summary order) (medical opinion evidence mirroring the specific restrictions reflected in the ALJ's RFC determination is not required when "the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] [RFC]"); *see also Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (an ALJ's conclusions need not "perfectly correspond with any of the opinions of medical sources cited in his decision").

Having found the foregoing argument unavailing, the Court would ordinarily next assess whether the ALJ's mental RFC formulation is supported by substantial evidence. *See Cook*, 818 F. App'x at 56. However, the Court declines to make any such finding at this juncture insofar as this case is already being remanded on other grounds, and per the below, on remand, the Court instructs the ALJ to reevaluate Dr. Russolillo's medical opinion as to the plaintiff's mental health and reformulate the plaintiff's mental RFC.

**B.     The ALJ's Adherence to the Regulations Governing Medical Opinion Evidence**

The plaintiff also argues that the ALJ erred in failing to evaluate the mental health medical opinions, including Dr. Russolillo's, in accordance with the regulations. (*See* Doc. No. 19-1 at 13–15). While remanding on other grounds, the Court agrees that the ALJ did not adequately explain his consideration of both the "consistency" and "supportability" of Dr. Russolillo's medical opinion.

The regulations governing medical opinion evidence demand that the ALJ explicitly consider the two "most important" persuasiveness factors of "supportability" and "consistency." *See* 20 C.F.R. § 416.920c(b)(2); *Glenn G. v. Kijakazi*, No. 22 CV 824 (RMS), 2023 WL 2477501, at *7 (D. Conn. Mar. 13, 2023) ("In her written decision, the ALJ must explicitly articulate how she considered the supportability and consistency factors") (internal quotation marks and citation

omitted); *Verna M. v. Kijakazi*, No. 21 CV 1590 (MPS) (RMS), 2022 WL 17251764, at *13 (D. Conn. Nov. 28, 2022) ("On remand, the ALJ is to explicitly consider the consistency and supportability factors of the medical opinion evidence and, in turn, the plaintiff's residual functional capacity determination and whether her RFC allows her to perform her past relevant work."); (*see also* Doc. No. 19-1 at 13–15).

Here, there is no mention or explanation by the ALJ as to how he addressed the "consistency" of Dr. Russolillo's medical opinion., *i.e.*, how the opinion squares with the other evidence in the record.  (*See* Tr. 25); *Rodriguez v. Kijakazi*, No. 21 CV 2358 (JCM), 2022 WL 3211684, at *11 (S.D.N.Y. Aug. 9, 2022) (explaining that "consistency concerns the degree to which the medical opinion is consistent with the other evidence in the record.").  Rather, the ALJ only noted that "the specific opinions of no limitation to only mild limitations in complex tasks is not fully consistent with the contemporary MOCA score of 20 out of 30 [performed by Dr. Russolillo] and the claimant's social avoidance described in Dr. Russolillo's report."  (Tr. 24). This analysis only goes to the "supportability" of the opinion, that is, "the degree to which the objective medical evidence and supporting explanations presented by [the] medical source support [his or her] the medical opinion[.]"  *Rodriguez*, 2022 WL 3211684, at *11; *see* 20 C.F.R. § 416.920c(c)(1).  While the Court acknowledges the scarcity of objective medical evidence in the record pertaining to the plaintiff's non-exertional limitations, the ALJ's assessment plainly does not speak to the "consistency" of Dr. Russolillo's medical opinion, *i.e.*, the degree to which it is consistent with the other evidence in the record, however scant it may be.  *Rodriguez*, 2022 WL 3211684, at *11.  Accordingly, on remand, the ALJ is directed to reassess Dr. Russolillo's opinion in accordance with the regulations.

### C.       Remand for Further Administrative Proceedings Is Appropriate

While the plaintiff seeks an order reversing and remanding to the Commissioner for the payment of benefits (*see* Doc. No. 19), the Court declines to do so.  "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Sonia N. B. A. v. Kijakazi*, No. 21 CV 709 (TOF), 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  The Court has reviewed the record and finds that the plaintiff has not provided persuasive proof that, during the relevant time period, he was disabled.  Moreover, as described herein, there are outstanding issues that need to be resolved by the Commissioner.  As such, "[r]emand for calculation of benefits would [] be inappropriate."  *Id*.  Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this Ruling.

## VI.      CONCLUSION

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 19) is **GRANTED in part** and **DENIED in part** to the extent the plaintiff seeks remand for the payment of benefits.  The Commissioner's motion to affirm that decision (Doc. No. 20) is **DENIED**.  The Court remands the case to the Commissioner for a new hearing and decision consistent with this opinion.  More specifically, on remand, the ALJ shall reformulate the plaintiff's physical RFC, and in doing so: (a) solicit additional medical opinion evidence; and (b) address the plaintiff's ability to do sedentary work (or less than sedentary work), and specifically evaluate a sit-stand option.  The ALJ is also instructed to reassess Dr. Russolillo's opinion and reformulate the plaintiff's mental RFC.  In reformulating the plaintiff's physical and mental RFC, the ALJ shall take care to review each medical opinion and ensure compliance with the regulations

governing medical opinion evidence, which demand that the ALJ explicitly consider the two "most important" persuasiveness factors of "supportability" and "consistency."

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c). As such, the Clerk of Court is further instructed that, if any party subsequently appeals to this court the decision made after remand, the appeal shall be assigned to the undersigned as the parties have consented the Court's jurisdiction.

The Clerk of Court shall enter judgment, remand this matter to the Commissioner, and close this case.

It is so ordered this 13th day of SEPTEMBER, 2023, at New Haven, Connecticut.

/s Robert M. Spector_____
Robert M. Spector
United States Magistrate Judge